H. J. PATTRIDGE v. G. H. JESSUP and Another.[1]

June 21, 1897.

Nos. 10,522—(180).

**Insolvency—Preference—Creditor's Knowledge of Insolvency.**

In an action by an assignee in insolvency to set aside a payment to a creditor on an antecedent indebtedness as an unlawful preference, and to recover back the amount paid, *held*, the finding of the court that at the time of such payment the creditor did not have reasonable cause to believe the assignors insolvent is sustained by the evidence.

Appeal by plaintiff, as assignee of Perry J. Newton and Eli P. Parks, from a judgment for defendants entered in the district court for Lyon county, pursuant to findings by Webber, J.    Affirmed.

*Morphy, Ewing & Gilbert*, for appellant.

In determining whether or not a payment to a creditor is void under our insolvency statute, neither actual knowledge nor actual belief of the debtor's insolvency is a criterion, but the question is whether, as a reasonable man acting with ordinary prudence, sagacity and discretion, a creditor had, in view of all the facts and circumstances known to him at the time of the payment, reasonable cause to believe the debtor insolvent.   Daniels v. Palmer, 35 Minn. 347.   If facts and circumstances are shown such as are clearly sufficient to put a person of ordinary prudence and discretion upon inquiry, and if, with knowledge of such facts and circumstances, he fails to investigate or inquire, he is chargeable with the knowledge which such investigation or inquiry would have furnished him. Daniels v. Bank, 35 Minn. 351;  Holcombe v. Ehrmanntraut, 46 Minn. 397;  Tripp v. Northwestern, 45 Minn. 383;  Hastings v. Heller, 47 Minn. 71;  Dow v. Sutphin, 47 Minn. 479;  Thompson v. Johnson, 55 Minn. 515.

*F. S. Brown* and *V. B. Seward*, for respondents.

It was competent for respondents to prove the solvency of the debtors by reputation.   Nininger v. Knox, 8 Minn. 110 (140).   It was competent for respondents to testify in regard to their belief

[1] Reported in 71 N. W. 916.

as to the solvency of the debtors Newton and Parks. It was proper to show their belief and their reputation in the manner it was shown. Berkey v. Judd, 22 Minn. 287; Hahn v. Penney, 60 Minn. 487, 62 Minn. 116.

CANTY, J.

This is an action by an assignee in insolvency to set aside a payment as an unlawful preference, and to recover back the amount paid.

The assignors, Newton & Parks, were partners running a mercantile business at Tracy, in this state, and the defendants were partners running a banking business at the same place. The former kept an account at the bank of the latter, and on March 10, 1894, were indebted to the latter in the sum of $1,600, represented by three promissory notes, one for $800, and the other two for $400 each. On that day Newton & Parks sold out their stock of merchandise to a third party for the sum of $1,500, and two days later, on March 12, paid defendants $820.90; $800 of which was applied on the two $400 notes, and the balance on the $800 note. Ten days afterwards Newton & Parks made an assignment to the plaintiff for the benefit of their creditors under the insolvency law. On the trial before the court without a jury the court found as facts that at the time of making said payment Newton & Parks were insolvent, and made the same with a view of giving to defendants a preference over the other creditors of the former, and that defendants thereby obtained such a preference, but did not at the time of receiving such payment have reasonable cause to believe the former to be insolvent. Judgment was ordered for defendants, and from the judgment entered thereon plaintiff appeals.

Appellant contends that the decision is not sustained by the evidence. From the previous November until the time of said payment different creditors had drawn drafts on the assignors through defendants' bank. There were six or eight of these drafts in all, and but three or four of them were paid. One was on a disputed claim, and the others were not paid because the assignors had no funds with which to pay them. One draft for $200 was accepted in October; $25 was paid on it November 14, and $50 December 8; the balance has not been paid. It was returned to the drawer Feb-

ruary 8, at the request of the assignors, who stated that they would write the drawer for more time in which to pay the balance. It does not appear what the amounts of the other drafts were, but it is fairly to be inferred that they were all small. Defendants admitted on the witness stand that they knew during this time that the assignors had debts which they could not pay, but state further that, as this was shortly after the panic of 1893, every merchant in town was in the same condition.

The assignors kept an account in defendants' bank, and made their last deposit of $75 on December 28, 1893, and shortly afterwards drew out all money so on deposit except $3.96, which remained as a balance to their credit until the time of the assignment. Prior to January 14, 1894, the assignors owed the defendants $1,200, and on that day the latter lent the former the further sum of $400. So far as appears, no security had ever been given for any of the amounts so loaned. At the time of the payment made March 12, none of the notes on which the payment was applied were either due or in the possession of the defendants, but had been rediscounted by them. However, the assignors and the defendants all testify that the notes for the other $1.200 were renewals which had been carried some length of time, and that there was an agreement to repay the amounts as soon as the assignors got the money, regardless of the time the notes had to run, as the bank was much in need of money on account of the financial stringency.

At the time of the payment one of the assignors came into the bank, and presented the check of the purchaser of their stock for $1,000, and told one of the defendants to apply $820.90 of it on the notes, and give him the balance to pay to the other bank. All of these witnesses also testify that the assignors never informed defendants of the sale at or prior to the time of such payment, and defendants both testify that they had not heard of the sale, and had no knowledge of it, until two or three days after such payment. The assignors had been in business at Tracy for four or five years. Evidence was given that until after the time of this payment their reputation in the community for solvency had never been questioned. All of this evidence is uncontradicted.

It has been a matter of much doubt with us whether this evi-

dence supports the finding that the defendants did not, at the time
of such payment, have reasonable cause to believe the assignors to
be insolvent.   As a general rule, a trader is insolvent when he is
not able to meet his engagements by making payment in the reg-
ular course of business.   Daniels v. Palmer, 35 Minn. 347, 29 N. W.
162.   But it nowhere appears what knowledge the defendants had,
at the time of such payment, of the wealth or means of the as-
signors; and, as before stated, it does not appear what the amount
was of the drafts presented to the assignors for payment through
the defendants' bank, except that one draft was for $200, as afore-
said, and $75 was paid on this as aforesaid.   For all that appears,
the aggregate amount of the three or four other drafts so dishonored
may not be $10.   True, the dishonor of such of these drafts as the
assignors admitted that they owed would ordinarily be conclusively
sufficient to put the defendants on inquiry, no matter how small the
amount of them may have been.

But the court will take judicial notice of the condition of things
shortly after the panic of 1893.   It was not uncommon at that time
for business concerns of very large means to find themselves tem-
porarily unable to pay very small claims.   As said by the trial
judge of the failure of the assignors to pay these drafts:

"If this had occurred under ordinary financial conditions, I should
have held it was sufficient to apprise the defendants of their in-
solvency, or at least to have put them upon inquiry; but it appears
from the uncontradicted evidence that the general reputation of
Newton & Parks for solvency was good, and that their ability to
pay all indebtedness had never been questioned, and that these
claims had been presented for payment at a time of great financial
stringency, when nearly every merchant was unable to meet his
payments promptly."

The confidence of the defendants in the ability and solvency of
the assignors was also shown by the loan of $400 which was made
in the midst of these times, and only about six weeks before the
payment here in question.   Again, defendants did not receive pay-
ment of their whole claim, or any more than about one-half of such
claim.   Again, it does not appear that at or prior to the time of
such payment the defendants were at all uneasy as to the solvency
of the assignors, or their ability to pay the large sum they owed

defendants, or that defendants solicited payment or security, or made any threats to enforce collection. On the contrary, they readily renewed the notes as they came due, and loaned the assignors $400 in addition to the $1,200 for which the notes had been so renewed from time to time. All of these circumstances tend to prove the good faith of defendants, and their want of knowledge of the insolvency of the assignors. And, while the evidence would certainly warrant a finding and judgment for plaintiff, we are unable to say that such evidence will not support the finding made.

Judgment affirmed.